## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

BOBBY JINDAL, GOVERNOR OF
THE STATE OF LOUISIANA                          CIVIL ACTION NO.

VERSUS                                          14-534-SDD-RLB

THE UNITED STATES DEPARTMENT
OF EDUCATION, AND ARNE DUNCAN,
IN HIS OFFICIAL CAPACITY AS U.S.
SECRETARY OF EDUCATION

## **RULING**

The Governor of the State of Louisiana, Bobby Jindal (hereinafter "Governor" or "Jindal") brings this action seeking a declaration that the Race to the Top program, a federal education grant program, and the ESEA waiver flexibility program implemented by the DOE, are *ultra vires* and unconstitutional.  Before the Court is Jindal's *Motion for Preliminary Injunction.*[1]  The United States Department of Education and United States Secretary of Education Arne Duncan ("referred to collectively as "Defendant(s)" or "DOE") oppose the *Motion for Preliminary Injunction* and re-urge a challenge to the Governor's standing.[2]

A hearing (hereinafter "the hearing") on the Governor's *Motion for Preliminary Injunction* was held on May 28 and 29, 2015.  The Court has considered the parties' pre-hearing and post-hearing briefs,[3] the arguments by the parties, and the testimony

---

[1] Rec. Doc. No. 2.
[2] Rec. Doc. No. 20. The DOE re-urges it motion to dismiss for lack of subject matter jurisdiction. Specifically, the DOE re-urges its challenges to standing. Before the preliminary injunction was set for hearing, the DOE filed a *Motion to Dismiss* for lack of standing, which the Court considered and denied without prejudice. Rec. Doc. No. 31.
[3] Rec. Doc. Nos. 52, 53, 73, & 74.
28287

and evidence submitted at the hearing.  The Court finds that the Governor's motion must be denied for the following reasons.

## I.    FACTUAL BACKGROUND

Jindal moves this Court to enjoin the DOE from enforcing what the Governor calls unlawful and coercive conditions which he contends are the *quid pro quo* for the State to receive Race to the Top (hereinafter "RTT") funds and ESEA waivers.  Jindal argues that the DOE coerced the State into adopting a common set of K-12 standards, colloquially known as "Common Core" and assessments aligned with those standards.[4] Jindal contends that the RTT program and the grants of conditional waivers under the Elementary and Secondary Education Act ("ESEA") exceed the DOE's statutory authority by violating federal education statutes and infringe upon the State of Louisiana's sovereign authority over education in violation of the Tenth Amendment to the United States Constitution.

The ESEA was passed in 1965 as part of the "War on Poverty," a component of President Johnson's Great Society legislation. The ESEA provided federal funding to state public schools, with accompanying conditions placed on the use of the funds. The ESEA has been reauthorized eight times since 1965.[5]  The ESEA provides for a wide variety of education programs.[6]  However, by far the largest federal funding component

---

[4] The Court has discussed at length the factual background and the government programs at issue in this case in its previous opinion addressed to standing.  *See* Rec. Doc. 31.

[5] Eloise Pasachoff, Article, Conditional Spending After NFIB v. Sebelius:  The Example of Federal Education Law, 62 Am. U. L. Rev. 577, 613.

[6] These programs include, *inter alia,* "education of the homeless, education of migrant children, education of English language learners, promoting technology in schools, funding for and drug-free school programs and funding of programs aimed at teacher quality." *Id.* at 614.

28287

of the ESEA, and the one at issue in this case, is Title I, which, when enacted in 1965, had as its central purpose the education of poor children.[7]

A major shift in the focus of the ESEA occurred in 2001 when the ESEA was re-authorized under the No Child Left Behind Act ("NCLB").[8]  Under NCLB, the purpose of the ESEA was dramatically transformed from providing funding for educating poor children to providing federal funding "to ensure that *all children* have a fair, equal, and significant opportunity to obtain a high-quality education and reach, at a minimum, proficiency on challenging State academic achievement standards and state academic assessments."[9]  Thus, beginning in 2001 with the enactment of NCLB, the significant federal ESEA dollars available to the States expanded to provide opportunities for high quality education for all children.[10]  NCLB transformed the ESEA as a whole. The funding conditions attendant to the ESEA were completely supplanted and changed by the NCLB.[11]

Jindal contends that the federal education funding conditions have changed again, this time by operation of RTT grants and ESEA flexibility waivers implemented by the Secretary of Education. Jindal claims that this change in conditions is both *ultra vires* and an unconstitutional infringement on States' Rights.

---

[7] The stated purpose of the ESEA was "to provide financial assistance . . . to local educational agencies serving areas with concentrations of children from low-income families to expand and improve their educational programs by various means (including preschool programs) which contribute particularly to meeting the special educational needs of educationally deprived children." Elementary and Secondary Education Act of 1965, Pub. L. No. 89-10, sec. 2, § 201, 79 Stat. 27, 27.
[8] 20 U.S.C. § 6301, *et. seq.*
[9] No Child Left Behind Act of 2001, Pub. L. No. 107-110, sec. 101, § 201, 79 Stat. 27, 27 (codified at 20 U.S.C. § 6301 (2006)).
[10] Pasachoff, *supra* note 5, at 618.
[11] *Id.* Compare 20 USC § 6311 (funding conditions) before and after NCLB. Jindal does not challenge the constitutionality of NCLB.
28287

## II.   THE FUNDING INITIATIVES AT ISSUE

### A.  The Race to the Top Program (RTT)

RTT is a $4.35 billion dollar DOE competitive grant program created to initiate and reward reforms in state and local district K-12 education.[12]  The program is funded by the Education Recovery Act as part of the American Recovery and Reinvestment Act ("ARRA") of 2009.[13] Through ARRA, Congress authorized the DOE to award "incentive grants" to states who, *inter alia*, "improved State academic content standards and student achievement standards" and who "enhanced the quality of academic assessments."[14]  In accord with that Congressional authority, the DOE implemented RTT, a voluntary competitive grant program.  State grant applications were scored by independent reviewers according to a point system that assigned points for satisfying specified educational policies.[15]

Louisiana applied for RTT grants three times, first in 2009, again in 2010, and finally in 2011.  Louisiana was unsuccessful in Phase 1, re-applied and qualified as a finalist in Phase 2, and, in 2011, was finally awarded a RTT grant in Phase 3, receiving an award of $17,442.972.00.[16]  Ultimately, the DOE awarded RTT grants to eighteen

---

[12] Hearing Exhibit Def-1 (All Hearing exhibits are listed in Rec. Doc. No. 69).

[13] *Id.*

[14] Pub. L. No. 111-5 § 14006(a)(2), 123 Sat. 115 (2009), and subsequently amended to authorize DOE to make grants to State consortiums "to develop academic assessments that are aligned with academic standards." Education Appropriations Act of 2010, Pub. L. No. 111-1117 § 310(2), 123 Stat. 3272 (2009). Plaintiff does not challenge the constitutionality of ARRA as appropriate Spending Clause legislation.

[15] *Id.*

[16] In November 2009, States were invited to submit applications for Phase I RTT grants. Louisiana applied but was unsuccessful in obtaining a Phase I RTT grant. In fact, only two states of the 41 which applied received Phase I grants. In June 2010, 36 states, including Louisiana, applied for grants in Phase II of the RTT program. Nine states and D.C. received Phase II grants. Although among the highest scoring states, Louisiana was unsuccessful in its RTT Phase II application. In May 2011, Phase II finalists, one of which was Louisiana, were invited to apply a third time for RTT grant money. Hearing Exhibit Def. 14, 15 and 16; Pl. Ex. 132 and 133 Rec. Doc. No. 70, 5/28 Transcript, p. 187; Hearing Exhibits Def-21 & Def-73.

28287

States, including Louisiana, and the District of Columbia.[17]   Significantly, Louisiana expressed a commitment to adopt and implement Common Core State Standards ("CCSS") and the Partnership for Assessment for College and Careers ("PARCC")[18] aligned assessments in all three of its RTT grant applications.   Notably, even after being unsuccessful in its first two RTT grant applications in 2009 and 2010, and without any promise that Phase 3 RTT funding would be available, Louisiana continued to move forward with its implementation of CCSS and aligned assessments.

**B.  ESEA and NCLB**

The ESEA[19] is a federal grant-in-aid program enacted in 1965 with the goal of improving educational opportunities for disadvantaged children.[20]   In return for federal monies, participating States must agree to comply with federal requirements that are meant to enhance the quality of elementary and secondary education and to further academic achievement.[21]   Importantly, however, States receive funds under Title I of the ESEA based strictly on a formula.   As explained by Plaintiff's expert in Education Law and Policy, Dr. Derek Black, ESEA Title I "money flow[s] by formula based upon students in seats."[22]

---

[17] Rec. Doc. No. 70, p. 127.

[18] PARCC is a consortium of States developing high quality assessments aligned with the Common Core State Standards; Louisiana joined in 2010.

[19] The Court notes the DOE's repeated argument that no challenge to the ESEA flexibility program was before the Court at the time of the hearing; however, the Court recently granted the Governor's *Motion for Leave to File Second Amended Complaint* which includes allegations relating to this program, and considerable evidence and testimony was presented on this issue at the hearing.   Thus, the Court will also consider the challenge to the ESEA flexibility program in the interests of justice and judicial economy.

[20] *See* testimony of Professor Derek Black, tendered by the Plaintiff and accepted by the Court as expert in Education Law and Policy. Rec. Doc. 71, pp. 10-12.

[21] 20 U.S.C. § 6301, *et seq.*

[22] Rec. Doc. 71, p. 39.

28287

As spending legislation, the ESEA is subject to periodic Congressional reauthorization.  The NCLB Act, enacted in 2001, is the most recent reauthorization of the ESEA.[23]  The stated goal of the NCLB Act is to "ensure that all children have a fair, equal and significant opportunity to obtain a high-quality education and reach, at a minimum, proficiency on challenging state academic achievement standards and state academic assessments." This was a noteworthy and significant change in federal education funding policy.[24]  The NCLB reauthorization of the ESEA expired in 2007.  Congress has not passed legislation to extend it since then.[25]  Under the NCLB, each State defined its own academic achievement standards and assessments.  Dr. Black testified that the effect of NCLB was that "what we had were 50 different State standards and 50 different assessment programs plus the District of Columbia."[26]  Unfortunately, the NCLB failed to achieve its goals.  Almost immediately after its enactment, the States exhibited widespread failures to achieve NCLB goals and objectives.  Within two to three years of its passage, "there were only four or five states that were actually on track."[27]  According to Dr. Black, "the primary problem early on was the failure to have highly qualified teachers in all core subjects."[28]  In 2011, it was recognized that, by the Fall of 2014, 80% of State Educational Agencies ("SEA") would be out of compliance with NCLB.[29]  In 2010, President Obama revealed his proposal for

---

[23] *Id.,* p. 17.
[24] *Id.*, p. 12.
[25] *Id.*, pp. 17-18.  The Court notes, however, that the Senate passed the Every Child Achieves Act on July 16, 2015 (S. 1177), which addresses many of the Governor's criticisms of the ESEA flexibility conditions. The House also passed a reauthorization bill in July of 2015 known as the Student Success Act (H.R.5).
[26] Rec. Doc. 71, p. 14.
[27] *Id.*, p. 17.
[28] *Id.*
[29] *Id.*, p. 46.
28287

ESEA reauthorization, known as the "Blueprint for Reform"; however, the Administration's proposal was never championed as legislation.

Against this backdrop, the DOE Secretary announced a program of ESEA waivers, commonly referred to as "ESEA flexibility."[30]  It is undisputed that the Secretary of the DOE has the authority to waive any statutory or regulatory requirement of the ESEA for a SEA that receives funding under the Act.[31]  The DOE offered SEAs the opportunity to request waiver of certain provisions of the ESEA if they made certain commitments to educational reform.  These waivers excused the performance of certain ESEA requirements and provided the SEAs and local education agencies ("LEA") with greater flexibility in the use of ESEA funds.[32]  SEAs are not required to request ESEA waivers or flexibility.[33]

After enthusiastically and publicly lauding the RTT program, leading Louisiana to be one of the first States to apply for a RTT grant, and voluntarily applying for ESEA flexibility,[34] Jindal now contends that both programs exceed the DOE's statutory

---

[30] Rec. Doc. No. 69, Hearing Exhibit Pla-95; Hearing Exhibit Def-37.

[31] 20 U.S.C. § 7861(a). Jindal does not contend that the waiver authority delegated to the Secretary of DOE is unconstitutional.  *See* Rec. Doc. No. 27, ¶ 41: "On September 23, 2011, the Department announced the Conditional No Child Left Behind ("NCLB") Waiver Plan, which allows the States to waive several major accountability requirements under the ESEA 'in exchange for rigorous and comprehensive State-developed plans designed to improve educational outcomes for students, close achievement gaps, increase equity, and improve the quality of education.'"  *See* Duncan letter at http://www2.ed.gov/print/policy/gen/guid/secletter).110923.html.  *See id.* ¶ 42: "In exchange for receiving a waiver, the Department requires States to agree to four conditions: (1) adopt college-ready and career-ready standards in at least reading/language and mathematics and develop and administer annual, statewide, aligned assessments that measure student growth in at least grades 3 through 8 and at least once in high school; (2) develop certain accountability systems; (3) develop and implement new systems for evaluating principal and teacher performance and student growth; and (4) remove certain reporting requirements that have little impact on student outcomes." (*See* U.S. Dept. Of Educ., *ESEA Flexibility Policy Document,* http://www.ed.gov/esea/flexibility/documents/esea-flexibility-acc.doc.18. Rec. Doc. No. 69, Exhibit Pla-25.

[32] 20 U.S.C. § 7861(a).

[33] Hearing Exhibit Def-36.

[34] Louisiana originally applied for and was granted an ESEA waiver on May 29, 2012. Rec. Doc. 27, Amended Complaint ¶ 46(a).

28287

authority under federal education laws and are an unconstitutional coercive infringement on the State's sovereign authority over education policy in violation of the Tenth Amendment to the United States Constitution.[35]

## III.   LAW & ANALYSIS

### A.  Standing

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges a federal court's subject matter jurisdiction.[36]   As Courts of limited jurisdiction, Federal Courts have power to adjudicate claims only when jurisdiction is conferred by statute or the Constitution.[37]   A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case.[38]

Every party that comes before a federal court must establish that it has standing to pursue its claims.[39]   The doctrine of standing asks "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."[40]   The Supreme Court has described standing as "contain[ing] two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement; and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction."[41]

---

[35] *See* Rec. Doc. No. 73, p. 1, citing 20 U.S.C. § 1232a; 20 USC. § 7907; 20 U.S.C. § 3403.

[36] *Herrera v. NBS, Inc.*, 759 F.Supp.2d 858, 860 (W.D. Tex. 2010).

[37] *Id.*, citing *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994); *Stockman v. Fed. Election Comm'n,* 138 F.3d 144, 151 (5th Cir. 1998).

[38] *Id.*, citing *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).

[39] *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469 (5th Cir. 2013).

[40] *Id.* at 473, quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004).

[41] *Id.*

28287

Because Article III standing is a threshold issue, the Court must address it before considering questions of prudential standing.[42]

Article III standing requires a plaintiff to show: "a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision."[43]  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."[44]

The DOE argues that the Governor has failed to establish an injury-in-fact sufficient to confer standing in this matter; however, the Court finds that the Governor has sufficiently pled the infringement of a constitutional right and statutory violation(s) of federal education laws.  The fact that the Governor ultimately may not prove such allegations on the merits under a preliminary injunction standard does not diminish his standing to bring these claims.  Thus, the Court finds that the Governor has Article III standing to bring this suit and adopts by reference its analysis and findings in its previous *Ruling*.[45]

### B. Standard on a Motion for Preliminary Injunction

An applicant for preliminary injunctive relief must establish all four of the following factors by a preponderance of the evidence: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3)

---

[42] *See Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 332 (5th Cir. 2002).

[43] *Lexmark Intern. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1386 (2014).

[44] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations and internal quotation marks omitted).

[45] Rec. Doc. No. 31.  *See also School District of the City of Pontiac v. Secretary of United States Department of Education*, 584 F.3d 253 (6th Cir. 2009)(district court held that school districts had standing to challenge the NCLB under the Spending Clause).  Because the Court finds that Article III standing has been established, the Court need not address prudential standing.
28287

that the threatened injury outweighs the harm to the party sought to be enjoined; and (4) that granting the preliminary injunction will not disserve the public interest.[46]  A preliminary injunction is an extraordinary remedy which should only be granted if the party seeking it has clearly carried the burden of persuasion on all four requirements.[47] "In the end, a preliminary injunction is treated as an exception rather than the rule."[48]

To warrant the extraordinary remedy of injunctive relief, the preponderance of the evidence must support the conclusion that Jindal is substantially likely to prevail on his claim that the spending programs are *ultra vires* because they violate express statutory prohibitions in the federal education acts, or that the programs infringe on state sovereignty in violation of the Tenth Amendment.  The Governor must also demonstrate that, without injunctive relief, the State faces substantial threat of irreparable harm.[49]

The Court finds that Jindal has failed to show by a preponderance of the evidence that there is a substantial likelihood that he will prevail on the merits and has failed to establish that the State faces irreparable injury.  Specifically, the Court finds that Jindal has failed to demonstrate a substantial likelihood of proving that the RTT program and the ESEA waiver flexibility program violate the federal education statutes ("Education Acts").  Jindal has also failed to demonstrate a substantial likelihood of proving that these programs violate the Tenth Amendment, because the evidence supports the finding that participation in both programs is completely voluntary and not

---

[46] *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F .3d 192, 195–96 (5th Cir. 2003).
[47] *Miss. Power & Light Co. v. United Gas Pipe Line, Co.*, 760 F.2d 618, 621 (5th Cir.1985).
[48] *Camellia Grill Holdings, Inc. v. New Orleans City*, No. 13-5148, 2013 WL 4431344 (E.D.La. Aug. 16, 2013) at *1, citing  *St. of Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975).
[49] The Court will consider these two factors together as the same facts and analysis form the basis for the Court's findings as to each factor.
28287

unconstitutionally coercive. The Court will first address the Governor's statutory challenges followed by the constitutional challenges to these programs.

### C. Statutory Challenges

The enabling legislation which established the U.S. Department of Education expresses Congressional acknowledgement of State sovereignty in the area of education. It provides:

> It is the intention of the Congress in the establishment of the [DOE] to protect the rights of State and local governments and public and private educational institutions in the areas of educational policies and administration of programs and to strengthen and improve the control of such governments and institutions over their own educational programs and policies. The establishment of the [DOE] shall not increase the authority of the Federal Government over education or diminish the responsibility for education which is reserved to the States and the local school systems and other instrumentalities of the States.
>
> * * * * *
>
> No provision of a program administered by the [DOE] shall be construed to authorize the [DOE] to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system…[50].

Substantive federal education laws likewise express statutory limitations on DOE authority in favor of State control over education.[51] Thus, Jindal argues, "Congress has

---

[50] 20 U.S.C. § 3403(a) and (b).

[51] General Education Provisions Act ("GEPA"), 20 U.S.C. § 1232a provides that "No provision of any applicable program shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system."
20 U.S.C § 7907 (a) – (c) prohibits "the Federal Government to mandate, direct, or control a State, local educational agency, or *school's* curriculum, program of instruction" and directs that "no funds provided to the Department under this chapter may be used . . . to endorse, approve, or sanction any curriculum designed to be used in an elementary school or secondary school" and further directs that "no State shall be required to have academic content or student academic achievement standards approved or certified by the Federal Government, in order to receive assistance under this chapter." NCLB, 20 U.S.C. § 28287

clearly expressed its lack of authority for and interest in legislating a national curriculum."[52]

The stated purpose and goals of federal education law and policy changed when the ESEA was reauthorized by NCLB in 2001.[53]  Prior to NCLB, Congress prohibited the DOE from directing or controlling state decision-making in the areas of "curriculum, programs of instruction, administration or personnel."[54] After passage of the NCLB, Congress further defined the limits of the DOE's authority and prohibited the DOE from mandating "specific elements of the State's academic content standards" and "specific academic assessment instruments"[55] and from requiring that State standards or assessments be certified or approved or the DOE.[56]

Thus, to succeed on his claim that these programs are *ultra vires*, Jindal must demonstrate that he is substantially likely to prove that the RTT and/or ESEA flexibility programs either: (1) dictate curriculum or programs of instruction, or (2) mandate specific elements of the State's academic content standards or academic assessment

---

6311(b)(1)(A) requires that each State adopt "challenging academic content standards" however "a State shall not be required to submit such standards to the Secretary."
NCLB 20 U.S.C. § 6311(e)(1)(F) provides that the DOE has "the authority to disapprove a State plan for not meeting the requirements of this part, but shall not have the authority to require a State, as a condition of approval of the State plan, to include in, or delete from, such plan one or more specific elements of the State's academic content standards or to use specific academic assessment instruments or items."

[52] Rec. Doc. 27, *Amended Complaint* ¶65.

[53] Before ESEA reauthorization in 2001 by the NCLB, the purpose of the ESEA was to provide federal funding for the education of economically disadvantaged pupils.  NCLB changed the stated purpose of federal funding for education to "ensure that all children have a fair, equal, and significant opportunity to obtain a high-quality education and reach, at a minimum, proficiency on challenging State academic achievement standards and state academic assessments." 20 USC § 6301. *See also,* discussion at pp. 5-6, *supra.*   "No longer limited to providing money for poor children, the Act now focuses on all children. Instead of vague language about meeting the 'educational needs of educationally deprived children,' now the law demands 'proficiency' on state tests.  [ESEA] 'is no longer a program to' provide federal education funding 'for the neediest among us, but rather an element of a comprehensive national plan to provide universal' excellence and equity in education." *See* Pasachoff, *supra* note 5, at 618-19 (citations omitted).

[54] *See,* 20 USC § 3403(b); 20 USC § 1232a; 20 USC § 7907(a); 20 USC § 7907(b).

[55] *See* 20 USC § 6311(e)(1)(F).

[56] *See* 20 USC § 6311(b)(1)(A) and 20 USC § 7907(c).

28287

instruments, or (3) that States are required to submit proposed content standards or assessments to the DOE for approval or certification.

1. RTT Statutory Challenge

The Governor concedes that the RTT program is funded through ARRA, not the ESEA, but he argues that, because RTT is a "program" as defined by GEPA, it is subject to the restrictions on the DOE's authority under the Education Acts.[57]  Assuming for the sake of argument that RTT is subject to the same statutory limitations applicable to other federal education initiatives, the Court finds that Jindal has failed to demonstrate a substantial likelihood of succeeding on his claim that the RTT program violates federal education law.  First, RTT does not mandate curriculum, programs of instruction, or personnel administration. Second, under RTT, States are not required to have content standards or assessments certified or approved by the DOE. Third, the DOE does not direct or require specific elements of a State's academic content standards or assessments.

Jindal argues that, owing to the scoring rubric used to evaluate State RTT grant applications, a State could not *win* RTT grant money unless the State adopted the CCSS and aligned assessments,[58]  which he argues operate as *de facto* curriculum.

---

[57] According to Jindal, RTT is governed by The Education Acts because it is a "program" as defined by GEPA 20 USC § 1221(c)(1) which includes "each program for which the Secretary or the Department has administrative responsibility under the Department of Education Organization Act [20 U.S.C.A. § 3401 *et seq.*] or under Federal law effective after the effective date of that Act."

[58] Jindal concedes that no state was required to adopt CCSS or aligned assessment to apply for a RTT grant, but he argues that "the competitive format and scoring rubric compelled states to do so in order *to win* an award." Rec. Doc. No. 73, p. 6 (emphasis in original). Jindal contends that the RTT scoring rubric effectively required States to adopt 100 percent of the CCSS and enter into a binding agreement with one of two federally-funded consortia developing assessments aligned to those standards. Jindal argues that these common standards together with aligned assessments are tantamount to curriculum. The DOE maintains that, even if the RTT program did mandate adoption of the CCSS and PARCC standards and assessments, this would not violate the law as standards and assessments do not constitute curriculum. 28287

The Education Acts clearly and unambiguously prohibit federal control over curriculum and programs of instruction.[59]   The evidence also demonstrated that a State's odds of winning RTT funds were increased if the State adopted CCSS and one of the aligned assessment programs.  The evidence revealed that the States that were successful in obtaining RTT grants did, in fact, adopt CCSS and aligned assessments.[60]  However, even if the Court assumes that the ONLY way a State could succeed in its quest for federal RTT dollars was to adopt the CCSS and aligned assessments, the evidence presented does not demonstrate that the Plaintiff is substantially likely to prove that the CCSS and aligned assessments constitute curriculum or programs of instruction.

Jindal failed to establish by a preponderance of the evidence that content standards and aligned assessments constitute, drive, or influence a State's local curriculum in a manner or to such a degree that they force upon a State a specific mandated curriculum in violation of federal law.   The testimony at the hearing established that the "ordinary meaning" of the term "curriculum" is distinct from the term "content standards."  The preponderance of the evidence established that curriculum is the "how" of instruction whereas content standards specify "what" should be learned.  In other words, standards represent the goals sought to be attained, whereas curriculum specifies the means and methods to be used in attaining those goals.[61]

---

[59] 20 USC § 3403(b); 20 USC § 1232a; 20 USC § 7907(a); 20 USC § 7907(b).
[60] Rec. Doc. No. 73, p. 6.
[61] *See* Testimony of Dr. Shanahan, PhD in Curriculum and Instruction, Def. Ex 75, pp. 266-268, 270, 273, 274-278, 321; Testimony of Linda Gojak, an expert in Curriculum, Rec. Doc. No. 71, pp. 145-146, 150-151.  Jindal offered the opinion testimony of Dr. Williamson Evers, who subscribes to a "macro" view of the meaning of "curriculum."  The Court found Dr. Evers' opinions in this regard bordering beyond the scope of his expertise, which was "Education Policy" and not Instruction or Curriculum.  Even assuming
28287

Jindal relies heavily on Dr. Williamson Evers' opinion that standards and aligned assessments drive curriculum.[62] The DOE's curriculum experts, Dr. Shanahan and Linda Gojak, dispute that standards drive or dictate curriculum but instead contend that standards merely influence curriculum.[63]

The preponderance of the evidence suggests that that, although standards inform curriculum, content standards do not dictate specific curriculum.[64]  Dr. Timothy Shanahan, a Ph.D. in Curriculum and Instruction, testified that there is little agreement among scholars as to a precise definition of "curriculum," but there is widespread agreement that content standards represent the "goals" whereas curriculum represents the "means" of achieving the goals.[65]  Professor Shanahan testified that "all 50 [states] make the distinction that standards are different from curriculum" as standards are the goal while curriculum is the means.[66]  Professor Shanahan was unaware of any curriculum expert who has defined content standards and/or assessments as constituting curriculum.[67]

Linda Gojak, an educator with 28 years of experience in the classroom and a Master's Degree in Curriculum and Supervision, opined that content standards do not mandate a specific curriculum.  Gojak testified that content standards represent the

---

that Dr. Evers was qualified to opine as to the ordinary meaning of "curriculum", the Court found Dr. Evers testimony unpersuasive.
[62] The Court accepted Plaintiff's expert, Dr. Williamson Evers, as an expert in Education Policy. DOE contends that Dr. Evers' opinions are ill founded and unreliable because he is a political scientist and holds no degree in Education or Curriculum. DOE points out that the very materials upon which Dr. Evers relies to form his opinions contradict his conclusion. Thus, the DOE contends Dr. Evers' opinion is insufficient to meet Jindal's burden of demonstrating a substantial likelihood of success on the merits. *See* Hearing Exhibit Pla-108 at 61; Exhibit Pla-140 at 47; Exhibit Pla-6 at 2; Exhibit Pla-148 at v.
[63] Rec. Doc. No. 71, Transcript 5/29, pp. 24-25.
[64] *Id.* at p. 151.
[65] Hearing Exhibit Def-75, pp. 273-274, 281-289, 321.
[66] *Id.* at pp. 274-278.
[67] *Id.* at pp. 321-322.
28287

knowledge students should obtain from a course, whereas curriculum is "how we are going to go about" teaching that knowledge, which includes the books and other materials that should be utilized, the order and sequence of presenting the material, and the methods employed by the teachers in instruction.[68]   Gojak explained that local school districts make decisions about how to incorporate community values into curriculum.[69]

Considering all of the evidence presented on this issue, the Court finds that neither of the challenged programs impermissibly mandates a particular curriculum or control a State's choice of curriculum materials or programs of instruction. While there can be no serious argument that content standards/assessments bear no relationship to curriculum, the Court finds that the evidence in this case shows a distinction between the two.  The weight of reliable evidence established that content standards and aligned assessments represent the skills to be mastered and/or concepts to be learned by a student while the curriculum is made up of the "how" teachers will go about conveying information that produces mastery.  Even if the Court agreed with Jindal's assertion that the DOE ostensibly mandates the adoption of the CCSS, there is no evidence in the record establishing that the CCSS is the DOE's forced choice of a particular curriculum. Simply put, if a LEA wishes to teach math skills by counting fingers and toes or by using flash cards or some other means, such is the sole choice and prerogative of the LEA.

---

[68] Rec. Doc. No. 71, 5/29 Transcript, pp. 150-151.
[69] *Id.* at p. 151.
28287

Where the words of a statute are clear and unambiguous, the Court is obliged to ascribe to them their ordinary meaning.[70]  There was insufficient evidence that RTT, as applied, violates the DOEA[71] or GEPA's[72] prohibition against federal "control over the curriculum, program of instruction, administration, or personnel of any educational institution, school, or school system."  There was no evidence to support a finding that RTT violates the ESEA's prohibition that "no funds provided to the Department under this chapter may be used . . . to endorse, approve, or sanction any curriculum designed to be used in an elementary school or secondary school."[73]

There was no evidence that the RTT grant program required that the State "submit" proposed standards to the Secretary for approval in violation of 20 USC § 6311(b)(1)(A).  There was no evidence that the DOE mandated or required "specific elements of the State's academic content standards" or that the DOE mandated or required the State to "use specific academic assessment instruments or items" in violation of 20 U.S.C. § 6311(e)(1)(F).  Finally, there was no evidence which showed that RTT required States "to have academic content or student academic achievement standards approved or certified by the Federal Government, in order to receive assistance under this chapter [ie. the ESEA]."[74]

---

[70] "In all cases involving statutory construction, [the court's] starting point must be the language employed by Congress, and [the court] assume[s] that the legislative purpose is expressed by the ordinary meaning of the words used." *INS v. Phinpathya*, 464 U.S. 183, 189, 104 S.Ct. 584, 589, 78 L.Ed.2d 401 (1984). "The canons of statutory construction dictate that when construing a statute, the court should give words their ordinary meaning and should not render as meaningless the language of the statute." *White v. Black,* 190 F.3d 366, 368 (5th Cir. 1999).
[71] 20 U.S.C. § 3403(a).
[72] 20 U.S.C. § 1232a.
[73] 20 U.S.C. § 7907(a).
[74] 20 U.S.C § 7907 (c).

28287

Rather, the evidence showed that the adoption of nationally benchmarked common content standards and assessments comprised part of the RTT selection criteria.[75]   The scoring rubric applied to State RTT grant applications encouraged standards that were "internationally benchmarked" and "college and career ready," but there was no evidence that the DOE defined the content of those standards.[76] Likewise, there was no evidence that the DOE approved or certified the standards or assessments.  In fact, the only evidence presented was to the contrary:  the DOE did not define, certify, or approve the content of standards or participate substantively in the development assessments.[77]   Finally, funding for the RTT program is utterly and completely separate and apart from funding under the ESEA; hence, RTT is not "assistance under this chapter [ESEA]" for purposes of 20 USC § 7907.  The statute is clear.  The DOE may not require that a State adopt "academic content or student academic achievement standards approved or certified by the Federal Government" in order to receive ESEA funds.[78]   There is no evidence before the Court to suggest that the RTT program violates federal education law.

2.   ESEA Waiver Program Statutory Challenge

Jindal contends that the ESEA flexibility program violates the same federal education laws addressed above. The Governor claims that the RTT program was the first step in the DOE's march to rewrite NCLB and that, when the ESEA was not amended to conform to President Obama's "Blueprint for Reform," the DOE "plowed ahead" and essentially re-wrote NCLB through the ESEA flexibility program.

---

[75] Hearing Exhibit Def-2 at 59850-51 & 59856.
[76] Rec. Doc. No. 70, 5/28 Transcript, pp. 101-104, 131.
[77] *Id.*
[78] 20 U.S.C. § 7907(c)("assistance under this chapter").
28287

Louisiana, like many other States, faced imminent penalties because it was in non-compliance with the NCLB.[79]  To avoid these consequences, like most States, Louisiana applied for waiver of ESEA/NCLB conditions (hereinafter "ESEA flexibility").[80] ESEA flexibility is essentially an application by a State to be "excused" for its NCLB failures and a request that the consequences for those failures be removed or not imposed.

The DOE acknowledged that, in exchange for a waiver of the NCLB conditions with which Louisiana was non-compliant, Louisiana agreed to adopt the CCSS and participate in PARCC.[81]  If Louisiana abandons either CCSS or PARCC, it is subject to the loss of its waiver unless an alternative is approved by the DOE.[82]  Jindal maintains that the adoption of CCSS and PARCC are unlawful conditions attached to ESEA flexibility.

As noted, federal education laws affirm State sovereignty in the field of education.  Turning once again to the express statutory limitations placed on the DOE, the Court finds that Jindal has failed to prove a substantial likelihood of succeeding on his claim that the ESEA flexibility program conditions are *ultra vires*.

Section 6311(b)(1)(A) of the ESEA provides that, "a State shall not be required to submit such standards to the Secretary." The evidence showed that "States only have to adopt standards. States do not have to submit proposed standards to the Department

---

[79] *See* Testimony of Dr. Black, Rec. Doc. No. 71, pp. 63-64.
[80] 20 U.S.C. § 7861(a). Congress vested the Secretary of the DOE with the authority to waive any statutory or regulatory requirement of the ESEA for a SEA that receives funding under the Act.
[81] Testimony of Scott Sargrad, Former Deputy Assistant Secretary for Policy and Strategic Initiatives for the Office of Elementary and Secondary Education. *See* Rec. Doc. No. 70, 5/28 Transcript, p. 235.
[82] *Id.*
28287

for approval."[83] Accordingly, the Court finds that ESEA flexibility program does not violate 20 U.S.C. 6311(b)(1)(A). Section 6311(e)(1)(f) provides that the Secretary shall "have the authority to disapprove a State plan for not meeting the requirements of this part, but shall not have the authority to require a State, as a condition of approval of the State plan, to include in, or delete from, such plan one or more specific elements of the State's academic content standards or to use specific academic assessment instruments or items." There was no evidence that Louisiana was required to include or delete "specific elements" of its content standards or that Louisiana was required to use "specific assessment instruments" as a condition of ESEA flexibility.[84]

The Court also finds no violation of Section 7907(c)(1).[85] There was no evidence presented that the DOE "approved" or "certified" Louisiana's standards as a condition precedent to granting Louisiana's request for ESEA flexibility.[86] The evidence established that a State need only demonstrate adoption of standards "common to a significant number of States," but the standards themselves were not required to be approved or certified by the DOE. Furthermore, Louisiana's request for, and receipt of, ESEA flexibility did not result in the "receipt of funds under [the ESEA]." Finally, Section 7907(c)(2) provides that "[n]othing in this subsection shall be construed to affect requirements under subchapter I of this chapter or part A of subchapter VI of this chapter," which direct the States to develop standards and assessments. The

---

[83] *Id.* at pp. 241-242.

[84] Jindal's argument that Louisiana was coerced into adopting Common Core and PARCC assessments is addressed *infra* in the analysis of the claim of Constitutional violation.

[85] 20 U.S.C. § 7907(c)(1) provides that "no State shall be required to have academic content or student academic achievement standards approved or certified by the Federal Government, in order to receive assistance under this chapter."

[86] In fact, the evidence was to the contrary: Scott Sargrad testified that "States only have to adopt standards. They don't have to submit the standards to the Department for approval." Rec. Doc. No. 70, 5/28 Transcript, pp. 241-242.

28287

ESEA/NCLB, which has not been challenged by Jindal, calls for the States to adopt standards and assessments.  The DOE is prohibited from specifying the particulars of those standards and assessments.  The record is devoid of evidence that the DOE approved or certified the standards and assessments adopted by Louisiana pursuant to its request for ESEA flexibility.

### D.  Constitutional Challenges

Jindal challenges the constitutionality of the RTT program and ESEA flexibility program on two grounds.  He argues that these spending programs are not related "to the federal interest in particular national projects or programs" and that the programs are impermissibly coercive. [87]

The Supreme Court in *South Dakota v. Dole* and *National Federation of Independent Business v. Sebelius* addressed the extent to which Congress may use its spending power to create incentives for States to act in accordance with federal policies.[88]   While instructive in their analysis and rationale, this case presents a distinct legal issue:   namely, whether the DOE, an executive agency, can use its congressionally endowed authority to create incentives for States to act in accordance with federal education policies.  It is axiomatic that an agency's power is no greater than Congress' power, hence, a spending clause analysis of the DOE's implementation of RTT and ESEA flexibility is instructive.

In *South Dakota v. Dole,* the Supreme Court addressed the constitutionality of a federal statute which conditioned a portion of the state's federal highway funds on the

---

[87] Rec. Doc. 27, *Amended Complaint* ¶¶ 65 and 66, citing *South Dakota v. Dole*, 107 S.Ct. 2793, 2796, 483 U.S. 203, 207 (1987).
[88] *South Dakota v Dole*,  483 U.S. 203 (1987); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2602 (2012).
28287

adoption of a minimum drinking age of twenty-one.  The Supreme Court enumerated a five prong inquiry to assess the constitutionality of placing conditions on the State's receipt of federal funds.[89]  The Court held the "encouragement to state action [was] a valid use of the spending power," and that acceptance of the drinking age "remain[ed] the prerogative of the States not merely in theory but in fact."[90]  In 2012, the Supreme Court applied the *Dole* factors in *Sebelius* and partially struck down spending legislation as impermissibly coercive.[91]  This Court is guided by the Supreme Court's rulings in *Dole* and *Sebelius* and the settled rule "that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act."[92]

### 1. RTT Constitutional Challenge

RTT[93] made federal grant money available to states which demonstrated a commitment to make significant progress in four key areas, including "[a]dopting

---

[89]  The funding must provide for the general welfare; conditions on funding must be unambiguously expressed; federal spending must be "related to the federal interest in particular national projects or programs"; the conditional spending program must not violate any other constitutional provisions; and while the conditional spending program may create incentives for States it may not coerce State decision making. *South Dakota v Dole*, 483 U.S. 203 (1987).

[90]  *Id.* at 211-212.

[91]  In *Sebelius*, 132 S. Ct. at 2604, the Court likened the Affordable Care Act's conditions on expanding Medicaid spending as a "gun to the head."  Addressing the clear notice requirement, the Court observed that "[t]hough Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post-acceptance or 'retroactive' conditions. A State could hardly anticipate that Congress's reservation of the right to "alter" or "amend" the Medicaid program included the power to transform it so dramatically." *Id.* at 2606 (internal citations omitted).

[92]  *Sebelius*, 132 S.Ct. at 2593, citing *Blodgett v. Holden,* 275 U.S. 142, 148, 48 S.Ct. 105, 72 L.Ed. 206 (1927) (concurring opinion).

[93]  The American Recovery and Reinvestment Act (ARRA) allocated $13 billion to the DOE to "finance incentive grants" to the states. The RTT was a competitive grant program implemented by the DOE under ARRA. American Recovery and Reinvestment Act of 2009, PL 111-5, February 17, 2009, 123 Stat 115. The stated purposes of the ACT were: (1) To preserve and create jobs and promote economic recovery; (2) To assist those most impacted by the recession; (3) To provide investments needed to increase economic efficiency by spurring technological advances in science and health; (4) To invest in transportation, environmental protection, and other infrastructure that will provide long-term economic benefits; and (5) To stabilize State and local government budgets, in order to minimize and avoid 28287

internationally benchmarked standards and assessments that prepare students for success in college and the workplace."[94]   The Court finds that Jindal has failed to demonstrate a likelihood of prevailing on his claim that the RTT program is not related to "ensuring that all children have a fair, equal, and significant opportunity to obtain a high-quality education."[95]   Moreover, the Court finds that, in funding ARRA, Congress delegated wide discretion to the DOE Secretary in the program's implementation.[96]

The Court further finds no evidence to support Jindal's claim that the RTT program unlawfully coerced the State into adopting the CCSS or joining PARCC.  Jindal concedes that applying for a RTT grant was completely voluntary. He concedes that Louisiana was not required to adopt the CCSS or join PARCC to apply for a RTT grant. Jindal concedes the RTT program did not identify nor mandate a particular set of common content standards.   Jindal argues that States had no real choice in the selection of standards because the CCSS were the only eligible standards "in the pipeline" when the RTT grant program was first noticed.[97]   He contends that Louisiana had to adopt CCSS and join PARCC in order to *win* a RTT grant.[98]   Jindal's argument demonstrates that Louisiana was satisfied to "follow the path of least resistance," to garner federal dollars, but there is no evidence that Louisiana was unconstitutionally coerced into applying for, or accepting, RTT grant funds.

reductions in essential services and counterproductive state and local tax increases.  Congress delegated authority to the "President and the heads of Federal departments and agencies [to] manage and expend the funds made available in this Act so as to achieve the purposes specified". *Id.*

[94] Fed. Reg. Vol. 74, No. 221 p 59688, Nov. 18, 2009.

[95] The stated goal of NCLB, enacted in 2001. See, 20 U.S.C. § 6301. *See also* Note 9, *supra.*

[96] *See* Education Appropriations Act of 2010, Pub.L. No. 111-117, § 310(2), 123 Stat. 3272 (2009); 20 U.S.C. § 10001, *et. seq.*

[97] Rec. Doc. No. 70, 5/28 Transcript, p. 108.

[98] Jindal argues that "the competitive format and scoring rubric compelled states to do so in order *to win* an award.  Otherwise, a state simply could not score high enough." Rec. Doc. No. 73, p. 6. (emphasis in original).

28287

"Congress[99] has no authority to order the States to regulate according to its instructions.  Congress may offer the States grants and require the States to comply with accompanying conditions, but the States must have a genuine choice whether to accept the offer."[100]  Thrice, Louisiana applied for RTT funds.  Jindal's actions at the time of Louisiana's RTT applications,[101] along with the three years that have elapsed between the grant award to Louisiana and the current complaints, undermine the Governor's constitutional claim of coercion regarding the RTT program.

The evidence showed that Jindal knowingly and enthusiastically committed the State to both the CCSS and the PARCC assessments, with full knowledge of their purposes, in order to receive federal RTT dollars.  There is simply no evidence that the State of Louisiana was forced to apply for the RTT grant or forced to adopt a particular set of standards. Under the facts of this case, "state officials [including Jindal] can fairly be held politically accountable for choosing to accept or refuse the federal [RTT] offer."[102]  The argument that Louisiana was somehow tricked by a "bait and switch"

---

[99] This applies *a fortiori* with respect to executive agencies.

[100] *Sebelius*, 132 S.Ct. at 2608.

[101] In 2010, Jindal applauded the RTT-State competition, announcing that "[t]he strategies promoted in this competitive grant program are a step in the right direction…"  Office of the Governor, State of Louisiana, *Jindal Applauds Louisiana's Great Position in 'Race to the Top'* (Nov. 5, 2009), http://www.gov.state.la.us/index.cfm?md=newsroom&tmp=detail&articleID=1739.  This statement was made after the May 2009 commitment of Louisiana by Jindal to join the CCSI in development of the Common Core State Standards.  In July 2010, BESE (the Louisiana Board of Elementary and Secondary Education) adopted by resolution the CCSS, and the Governor voiced support for the standards.  *See e.g.* Gov. Jindal Press Release (Jan. 17, 2012), http://gov.louisiana.gov/index.cfm?md=newsroom&tmp=detail&articleID=3197&printer=1 ("Over the past four years, we've already taken steps to meet these goals [of education reform], including … [a]dopting the Common Core State Standards, which will raise expectations for every child."). Rec. Doc. No. 19-1;. *see also,* Note 16*, supra.*

[102] "[W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision. Spending Clause programs do not pose this danger when a State has a legitimate choice whether to accept the federal conditions in exchange for federal funds. In such a situation, state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer." *Sebelius*, 132 S.Ct. at 2602-03 (internal citations omitted).
28287

scheme[103] is simply unsupported by the record evidence before the Court.  No existing federal funding was conditioned on applying for, or obtaining, a RTT grant.  RTT was a stand-alone program.[104]  The RTT program was not coercively tied to, nor were States exposed to, a risk of the loss of ESEA funds.[105]

Furthermore, according to the evidence, every State which received RTT grants subsequently amended its RTT application at some point, yet no amendment has ever been rejected by the DOE.[106]  Moreover, evidence that at least three States that received RTT awards discontinued CCSS with no reduction in award money, further undermines Jindal's alleged threat of irreparable harm to Louisiana.[107]  Indeed, Louisiana recently discontinued the PARCC assessments for high school[108] without adverse impact or consequence on Louisiana's RTT grant.[109]

The Court finds that the operation of the RTT program is not unlike the federal statute at issue in the *Dole* case.[110]  The DOE never endorsed, and did not participate in, the creation of the CCSS or any other set of standards.  These standards were

---

[103] Jindal ultimately argues that RTT was used by the DOE as a lure for states to adopt CCSS and PARCC, which ultimately became the *quid pro quo* for NCLB waivers.  Rec. Doc. No. 52, p. 3.

[104] Jindal's expert in Federal Education Law and Policy, Professor Derek Black, supports this conclusion. Dr. Black opined that the RTT grant program "does not change ESEA in any way.  ESEA is still in effect. It was an attempt to spur innovation and it came in really as part of an overall attempt to help states with failing budgets." Rec. Doc. No. 71, 5/29 Transcript, p. 18, lines 18-21.

[105] The facts established by the evidence in this case are markedly distinct from the ACA legislation which the Supreme Court analyzed in *Sebelius*. In *Sebelius*, the Court found that "Congress is coercing the States to adopt the changes it wants by threatening to withhold all of a State's Medicaid grants, unless the State accepts the new expanded funding and complies with the conditions that come with it." *Sebelius*, 132 S.Ct. at 2601.

[106] *See* Testimony of Ann Whalen, Rec. Doc. No. 70, p. 189; 200.

[107] The States of Florida, Georgia, and Kentucky, all recipients of RTT grants, have subsequently withdrawn from one of the two consortia, and none of these States have lost their RTT grants.  *See* Testimony of Patrick Rooney, Rec. Doc. No. 71, p. 191.

[108] Louisiana replaced PARCC assessments in High Schools with "PLAN" assessments (ACT's college and career readiness assessment tools).

[109] Rec. Doc. No. 71, 5/29 Transcript, pp. 111-112; Hearing Exhibit Def-46 at p.42 & Def-76.

[110] 483 U.S. 203 (1987). The Court acknowledges that Jindal is not making a claim that Congress has exceeded its authority under the Spending Clause in funding the RTT program through ARRA; rather, the Governor claims that the DOE exceeds its discretionary authority in implementing the program.

28287

developed by members of a consortium of States, one of which was Louisiana.[111]  Much like South Dakota's acceptance of the mandated drinking age, applying for a RTT grant remained the prerogative of Louisiana "not merely in theory but in fact."[112]  The Court concludes that Louisiana had a meaningful and genuine choice whether to accept the DOE's offer of RTT dollars.[113]

Put simply, if Louisiana did not wish to compete for RTT in accord with the published scoring rubric requirements, it should not have entered the competition and applied for the grant - not one, but three times.  With rights come responsibilities.  The State, possessing the right of sovereignty, has an attendant responsibility to conduct itself as a sovereign before embarking on decisions that commit the State to policies. The State cannot follow the path of least resistance to money and then complain, after the fact, when a decision freely made produces unintended results or becomes politically unpopular.  "In the typical case we look to the States to defend their prerogatives by adopting 'the simple expedient of not yielding' to federal blandishments when they do not want to embrace the federal policies as their own. The States are separate and independent sovereigns. Sometimes they have to act like it."[114]

### 2.  ESEA Flexibility

Jindal has failed to demonstrate a substantial likelihood of prevailing in his claim that the ESEA flexibility conditions are not related to a federal interest in national

---

[111] *See* 74 Fed. Reg. at 59733 CRS Report at 22.

[112] In *Dole*, the Supreme Court held that whether to accept the drinking age "remain[ed] the prerogative of the States not merely in theory but in fact."  483 U.S. at 211-212.

[113] "Congress has no authority to order the States to regulate according to its instructions. Congress may offer the States grants and require the States to comply with accompanying conditions, but the States must have a genuine choice whether to accept the offer." *Sebelius,* 132 S.Ct. at 2608.

[114] *Sebelius*, 132 S.Ct. 2566, 2603 (2012), citing, *Massachusetts v. Mellon,* 262 U.S. 447, 482, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

28287

projects or programs. The stated purpose of NCLB is to make federal funding available to "ensure that all children have a fair, equal, and significant opportunity to obtain a high-quality education."[115]   Congress gave the Secretary of the DOE broad discretion to waive *any* provision of the Act.   Pursuant to that authority, the Secretary implemented the ESEA flexibility program, which allows States to ameliorate the punitive consequences of a state's non-compliance with NCLB in exchange for the State's agreement to implement "college and career ready" standards and aligned assessments.   Jindal does not allege that the waiver authority vested in the Secretary is unconstitutional, nor does Jindal assert a facial challenge to the Secretary's power to grant waivers on conditions.[116]   Rather, Jindal maintains that the waiver conditions imposed (as applied) by the Secretary are unconstitutional.

Citing the testimony of Professor Black,[117] Jindal claims that losing the ESEA waiver could result in the actual loss of education funds that would have "catastrophic consequences" for both the State's public school and the State's budget.[118] According to Professor Black, if a State has not obtained ESEA waivers and has reached the final stages of non-performance under NCLB, and the State fails to initiate corrective action required by ESEA/NCLB, the DOE could withhold ESEA Title I funds.[119]

However, the overwhelming evidence makes clear that the ESEA flexibility program itself does not place a State's ESEA funding at risk.  To the contrary, the ESEA

---

[115] Pub. L. No. 107-110, Sec. 101, § 201, 79 Stat. 27, 27.

[116] Jindal does not advocate that NCLB waivers must be without conditions. Indeed, unconditional waivers, would have the effect of repealing the underlying legislation, and eviscerate NCLB's goal of "ensur[ing] that all children have a fair, equal, and significant opportunity to obtain a high-quality education."  In this sense, the only meaningful way to uphold the purpose of the NCLB, which the DOE is charged to administer and implement, is to impose meaningful conditions.

[117] Rec. Doc. No. 71, 5/29 Transcript, pp. 63-38.

[118] Rec. Doc. No. 73, p. 8.

[119] Rec. Doc. 71, 5/29 Transcript, p. 65.

28287

flexibility program preserves and protects the State's federal funding, the control over which is otherwise at risk owing to a State's non-compliance with NCLB.  Any risk to a State's ESEA Title I funding is the consequence of a chain of events which starts with the State's persistent and repeated non-compliance with NCLB,[120] followed by the State's refusal to take the corrective actions specified by the NCLB.

The ESEA flexibility program does not award funds to States or threaten State funding.[121]  Federal funding is jeopardized by non-compliance with NCLB. Under NCLB, if a school or LEA repeatedly fails to make Adequate Yearly Progress ("AYP"), NCLB sets forth a series of escalating interventions from which the school or LEA must choose corrective action.[122]  "Importantly, those interventions do not involve taking funds from LEAs."[123]  The only way the State can potentially lose Title I ESEA funds is to refuse to initiate the corrective actions mandated by 20 U.S.C. §6316(b) and (c). In other words, the threat to funding is by operation of the NCLB, not the waiver program.[124]

ESEA flexibility provides a mechanism which enables States to preserve NCLB funding despite non-compliance with the Act.  In this way, the ESEA flexibility furthers the interest of "ensur[ing] that all children have a fair, equal, and significant opportunity

---

[120]  DOE Deputy Director in the Office of State Support Patrick Rooney explained that following 7 consecutive years of failure to achieve AYP, an ESEA may be required to "restructure" as part of the corrective action. *See* 20 USC § 6316(b)(7). He disputes that corrective restructuring requires closing the school.  Rooney also testified that failure to make AYP does not result in the loss of Title I funds.  Rather, it is the failure to implement corrective action that places ESEA funds at risk. Rec. Doc. 71, pp. 85-88.
[121]  Scott Sargrad testified that ESEA flexibility does not provide additional federal funding to states. Rec. Doc. No. 70, 5/28 Transcript, pp. 225-226.
[122]  20 U.S.C.§ 6316(b)(c).
[123]  Rec. Doc. No. 74, p. 4, fn 5, citing Rec. Doc. No. 71, 5/29 Transcript, pp. 85-86; 88 (Patrick Rooney testified that a school or district does not lose money as a consequence of losing a waiver under the ESEA).
[124]  Jindal has not challenged, and the Court is not called upon to address, whether DOE's waiver authority implicitly extends to include conditional waivers. *See* discussion at p.29 and Note 128, *infra.*
28287

to obtain a high-quality education."[125] The Court finds that encouraging states to adopt "college and career ready" standards and aligned assessments, in lieu of sanctions provided for under the NCLB, is related to NCLB's goal of "ensur[ing] that all children have a fair, equal, and significant opportunity to obtain a high-quality education."[126]

The Court also finds that Jindal has failed to demonstrate a substantial likelihood of prevailing in his claim that the ESEA flexibility conditions are unconstitutionally coercive. According to Jindal, the simple fact that virtually all States have sought NCLB waivers establishes the necessity, and belies the alleged voluntariness, of applying for a waiver.[127] Jindal claims that "forced choice is not a choice."[128]

The evidence of widespread failure of NCLB, and the escalating and ultimately severe consequences for NCLB non-compliance, suggests that States may be under a fair amount of pressure to obtain ESEA waivers. However, motivation to seek waivers in order to ameliorate the consequences of NCLB non-compliance is not tantamount to coercion. Again, *Sebelius* is instructive. In *Sebelius,* the conditions threatened other significant independent funding sources; hence, the conditions were "viewed as a means of pressuring the States to accept policy changes."[129] In this case, the conditions protect, rather than threaten, NCLB funding. States are not financially penalized for not seeking ESEA flexibility; rather, penalties, if any, flow from non-compliance with the NCLB.[130]

---

[125] 20 U.S.C. § 6301.

[126] *Id.*

[127] *See* Testimony of Dr. Black, Rec. Doc. No. 71, p. 17.

[128] Rec. Doc. No. 73, p. 8.

[129] *Sebelius*, 132 S.Ct. at 2604.

[130] "What Congress is not free to do is to penalize States that choose not to participate in that new program by taking away their existing [] funding. *Sebelius*, 132 S.Ct. 2566, 2607 (2012).
28287

Jindal offered no evidence whatsoever that States were unaware of the consequences of NCLB non-compliance.  Likewise, there is no evidence that States were unaware of the Secretary's broad discretionary waiver authority.  Finally, the evidence showed that States were notified of the requirements for obtaining ESEA flexibility.[131]   States were free to apply or not.  Jindal has failed to show that he is substantially likely to prevail on a claim that ESEA flexibility is coercive.

Jindal also gives short shrift to the fact that the ESEA flexibility requirement that States adopt "college and career ready" standards can be accomplished in one of two ways.  Either a State can adopt the CCSS[132] (Option A), or a State can demonstrate that it "has adopted college and career ready standards in at least reading/language arts and mathematics that have been approved and certified by a State network of Institutions of Higher Education [IHEs]"[133] (Option B).  Under Option B, States must commit to implement "standards that are approved by a State network of institutions of higher education, which must certify that students who meet the standards will not need remedial course work at the postsecondary level."[134]  Jindal claims that the States have no true second option and that adopting CCSS is the only real choice.[135]

The evidence does not substantiate Jindal's claim. The evidence shows that a number of States have received ESEA flexibility without adopting the CCSS.[136]  The State of Virginia elected Option B, and, having developed standards that were certified

---

[131] Hearing Ex. Def-37.

[132] The CCSS qualify as college and career ready standards.

[133] Hearing Exhibit Def-40 at 10; Rec. Doc. No. 70, 5/28 Transcript, pp. 227-229 ("IHE"s are Institutions of Higher Education).

[134] *Id.*, citing Hearing Exhibit Pla-25 at p. 5.

[135] Citing testimony of Professor Black, Rec. Doc. No. 71, Transcript, 5/29, p. 63, Jindal contends that "[t]he lack of guidance for alternative standards and the strict timeline required for compliance rendered this alternative an illusory choice." Rec. Doc. No. 73, p. 10.

[136] Rec. Doc. No. 70, 5/28 Transcript, p. 223, lines 4-6.

28287

by its State commission on higher education, received ESEA flexibility.[137]  Furthermore, the DOE presented evidence of States that had adopted the CCSS when they requested and received flexibility, but later dropped the CCSS and substituted their own standards certified by a State network of IHEs, and those States retained their ESEA flexibility.[138]  Like Louisiana, three States with RTT awards and ESEA flexibility dropped PARCC assessments altogether and amended their ESEA flexibility requests to substitute their own assessments, all without consequence.[139]

The Court finds that the Governor failed to establish that States are coerced into the adoption of a particular set of standards and aligned assessments.  The Court found Dr. Black to be highly credible and knowledgeable in the field of Education Law and Policy and found his testimony to be well-reasoned and persuasive regarding the widespread compliance problems with the ESEA and NCLB and the resulting burden placed on States in obtaining ESEA flexibility.  However, even Dr. Black could not testify with any certainty that the State of Louisiana sought a waiver due to pressure or coercion.   In fact, Dr. Black testified that "whether or not an individual state feels pressure, or doesn't feel pressure, I can't say for sure."[140]

Second, the fact that other States have withdrawn from the CCSS and chosen Option B to obtain waivers negates the Governor's contention that this option is

---

[137] Hearing Exhibit Def-67 at 22; Rec. Doc. No. 70, 5/28 Transcript, p. 227-229. The State of Virginia does not have a university system.  *Id.* at p. 244.

[138] Rec. Doc. No. 70, 5/28 Transcript, p. 229-232.

[139] Rec. Doc. No. 71, 5/29 Transcript, pp. 114-119; 234; Hearing Exhibits Def-47-Def-49. As previously stated, Louisiana discontinued PARCC high school assessments with zero effect on its RTT award or ESEA flexibility.  Specifically, Louisiana replaced the PARCC high school assessments with the ACT college and career readiness test for tenth graders. Louisiana's amended ESEA flexibility request was approved by the DOE and Louisiana suffered no adverse consequence to either its RTT award or its ESEA flexibility *Id.* at pp. 111-112; Hearing Exhibits Def-46 at 42 & Def-76.

[140] Rec. Doc. No. 71, 5/29 Transcript, p. 63, lines 15-16.

28287

Case 3:14-cv-00534-SDD-RLB   Document 75   09/16/15   Page 32 of 33

practically impossible.[141]  The evidence revealed "a number of States that have received the ESEA flexibility that have not adopted the Common Core State Standards."[142]  Evidence that other States have taken the steps to discontinue CCSS without funding consequence undermines the Governor's argument that the harm (loss of funds) is likely, much less imminent.  What is clear to the Court is that the loss of a waiver could affect a State's control over the allocation of the funds it is provided;[143] however, that does not constitute a loss of "assistance under this chapter."[144]  At this stage, the Governor's alleged threat of this particular injury is highly speculative.

---

[141] Rec. Doc. No. 73, p. 10, fn 43:  "The complex and time consuming option of pursing the state's own set of standards certified by 'a system of institutions of higher education' was not achievable within the timeline FDOE demanded."
[142] Rec. Doc. No. 70, 5/28 Transcript, p. 223, lines 4-6.
[143] Rec. Doc. No. 74, p. 4, n. 6.
[144] 20 U.S.C. §7907(c)(1).
28287

Page 32 of 33

IV.    **CONCLUSION**

Accordingly, for all of the reasons set forth above, the Court finds that Jindal's evidence fails to meet his burden of establishing that the alleged risk of irreparable injury to the State of Louisiana is substantial, likely, or irreparable.  In fact, the alleged injuries that Jindal anticipates, should the State discontinue use of the CCSS, appear to be purely speculative considering similar actions taken by other States that have not suffered the anticipated consequences.  Jindal failed to introduce any reliable evidence that the CCSS go beyond establishing standards and assessments and encroach upon the area of curriculum.  Thus, the Court finds that Jindal has failed to establish the threat of irreparable injury or that there is a substantial likelihood of success on the merits as to both his statutory and constitutional challenges to the RTT and ESEA flexibility programs.

For the reasons set forth above, the *Motion for Preliminary Injunction*[145] by Jindal is DENIED.[146]

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana, on September 15, 2015.


_Shelly D. Dick_

**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[145] Rec. Doc. No. 2.
[146] The Court has considered all of the evidence, testimony, and legal arguments presented by both parties in this matter whether or not specifically addressed herein.
28287